

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

---

No. 08-23-00347-CV

---

In the Interest of A.L.K., Minor Child

---

On Appeal from the 383rd Judicial District Court
El Paso County, Texas
Trial Court No. 2020DCM5085

---

## MEMORANDUM OPINION

Appellant (Jasmine) and Appellee (Jun) are the parents of A.L.K., who was born in El Paso, Texas, on November 3, 2016.[1] Following a de novo hearing, the trial court entered a Final Order in Suit to Modify the Parent-Child Relationship, from which Jasmine now appeals. In several issues on appeal, Jasmine asserts the trial court abused its discretion by: (1) granting Jun the

---

[1] To protect the identity of the children mentioned in this opinion, we will refer to adults by their first names. Appellant and Appellee's daughter, who is the subject of this suit, will be referred to as A.L.K. or simply as "the child." Appellant has two other daughters: one who was 12 years old at the time of a May 2023 de novo hearing whom we will refer to as L.M., and an infant who was five months old at the time of the May 2023 hearing whom we will refer to as "the baby." *See* Tex. R. App. P. 9.8(a).

exclusive right to make all education decisions for A.L.K.; (2) ordering "a 50-50" possession schedule; (3) sua sponte removing a two-hour right of first refusal when neither party requested that it be removed; and (4) imposing a geographic restriction on A.L.K.'s residence. Because we conclude that Jasmine has not demonstrated that the trial court abused its discretion, we affirm.

## I. BACKGROUND[2]

Jun and Jasmine are both from El Paso. When A.L.K. was a few months old, the family moved to Austin, Texas. When A.L.K. was about 24 months old, Jasmine left Jun and moved back to El Paso with A.L.K. Jun and Jasmine divorced in 2020, and the order they sought to modify in the underlying proceeding is entitled "Child Support Review Order (Suit Affecting The Parent-Child Relationship-AOP)" and dated September 30, 2020. In the September 2020 order, both parents were appointed joint managing conservators and Jasmine was designated as the conservator with (1) "the exclusive right to designate the primary residence of the child . . . without regard to geographic location" and (2) "the right to make decisions concerning the child's education."

On August 11, 2022, Jun filed a Petition to Modify Parent-Child Relationship. Jun remarried. In either September or October of 2022, Jun and his new wife, Carol, moved to El Paso. Jasmine remarried on August 26, 2022, to a man she had dated for about two years and who lives in Georgia. Jasmine had the baby with her new husband; she gave birth in El Paso.

In his petition, Jun asserted that the circumstances of the child, a conservator, or other party affected by the order to be modified had materially and substantially changed since the date of rendition of the order to be modified and that the child's present environment may endanger the child's physical health or significantly impair the child's emotional development. He asked that

---

[2] Testimony and exhibits from the de novo hearing will be recounted in the relevant sections.

he be designated as the conservator with the exclusive right to designate the primary residence of the child, that Jasmine be given possession of and access to the child according to the standard possession order or as deemed appropriate by a family therapist, and that his child support obligation be decreased. On September 8, 2022, Jasmine filed a Counterpetition to Modify Parent Child Relationship seeking to increase child support and requesting attorney's fees.

On December 5, 2022, Jun filed a first amended petition in which he sought the same relief as in his original petition and also requested the exclusive right to make educational decisions for A.L.K. (including but not limited to choosing the school she attended) and A.L.K.'s residence to be restricted to El Paso, Texas.

Following a hearing on December 12, 2022, the associate judge signed Findings and Recommendations that included: (1) appointing both parents joint managing conservators of A.L.K.; (2) awarding Jasmine the exclusive right to determine A.L.K.'s residence in El Paso County, Texas; (3) awarding Jun the exclusive right to make decisions regarding A.L.K.'s education and ordering Jun to confer with Jasmine before making decisions regarding the child's education; (4) determining that neither party should pay child support; (5) awarding access and possession of A.L.K. to Jun and Jasmine based on a 2-2-3-3 schedule; and (6) granting each party a right of first refusal to care for A.L.K. when a party could not personally care for her for a period of two hours or more. Jasmine filed a request for a de novo hearing.

On May 22, 2023, a de novo hearing was conducted by Judge Lyda Ness-Garcia at which several witnesses testified. On June 14, 2023, Jasmine filed a motion to recuse Ness-Garcia. The motion was later denied. On September 8, 2023, Ness-Garcia signed a final order that included: (1) a finding that material and substantial changes exist since the rendition of the last order and that these orders are in the best interest of the child; (2) awarding Jasmine the exclusive right to determine A.L.K.'s residence in El Paso County, Texas; (3) awarding Jun the exclusive right to

3

make decisions regarding A.L.K.'s education, with no change to the school for the remainder of the 2023 spring semester; (4) ordering Jun to confer with Jasmine before making decisions regarding A.L.K.'s education; (5) ordering Jun to pay Jasmine child support; (6) ordering that the parties continue to exercise the same 2-2-3-3 schedule as ordered by the associate judge; and (7) granting each party a right of first refusal to care for the child when a party cannot personally care for the child if the parent in possession will not be present overnight.

Jasmine appealed, asserting that the trial court abused its discretion by (1) granting Jun the exclusive right to make all education decisions for A.L.K.; (2) ordering "a 50-50" possession schedule; (3) sua sponte removing the two-hour right of first refusal when neither party requested that it be removed; and (4) imposing a geographic restriction on A.L.K.'s residence. In 2024, after Jasmine alleged that the reporter's record was inaccurate, we abated the appeal and ordered the parties to attempt to correct inaccuracies, if any, by agreement pursuant to Rule 34.6(e)(1). Alternatively, if the parties could not agree, we ordered the trial court to settle the dispute and order the court reporter to conform the reporter's record (including text and any exhibits) to what occurred in the trial court and to file certified corrections. Earlier this year, after receiving the corrected supplemental reporter's record, we reinstated the appeal and established a briefing schedule.

## II. APPLICABLE LAW AND STANDARD OF REVIEW

A court may modify an order providing for the possession of or access to a child "if modification would be in the best interest of the child and . . . the circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since . . . the date of the rendition of the order." Tex. Fam. Code Ann. § 156.101(a)(1)(A). "The party seeking modification bears the burden to establish these elements by a preponderance of the evidence." *Int. of A.N.G.*, 631 S.W.3d 471, 479 (Tex. App.—El Paso 2021, no pet.). "The best

4

interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002(a).

"[A] material and substantial change in circumstances must be proved *before* inquiry is made into the best interest of the child." *Int. of K.S.F.*, No. 05-21-01030-CV, 2023 WL 1501632, at *4 (Tex. App.—Dallas 2023, no pet.). And "the changed circumstances must be material and substantial." *In Int. of A.B.R.*, No. 04-17-00220-CV, 2018 WL 3998684, at *4 (Tex. App.—San Antonio Aug. 22, 2018, no pet.) (mem. op.). To demonstrate that a material and substantial change of circumstances has occurred, the evidence must show what conditions existed at the time of the entry of the prior order as compared to the circumstances existing at the time of the hearing on the motion to modify. *See In re C.C.J.*, 244 S.W.3d 911, 919 (Tex. App.—Dallas 2008, no pet.). In other words, "the record must contain both historical and current evidence of the relevant circumstances," otherwise "the court has nothing to compare and cannot determine whether a change has occurred." *Zeifman v. Michels*, 212 S.W.3d 582, 594 n.1 (Tex. App.—Austin 2006, pet. denied).

"There is no bright-line rule for determining what is in a child's best interest; each case must be determined on its own unique set of facts." *See Int. of S.G.*, No. 08-19-00008-CV, 2020 WL 103971, at *6 (Tex. App.—El Paso Jan. 9, 2020, no pet.) (mem. op.); *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002). In determining a child's best interest, a court may use the non-exhaustive list of the factors set forth in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976). Those factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child, (7) the stability of the home, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a

proper one, and (9) any excuse for the acts or omissions of the parent. *Id.* at 371–72. In the context of custody modification, other factors to be considered include the child's need for stability and the need to prevent constant litigation in child-custody cases. *S.G.*, 2020 WL 103971, at *7.

"We review a trial court's modification of conservatorship, terms of possession and access, and child support for abuse of discretion, i.e., whether the court acted arbitrarily or without any reference to guiding legal principles." *Int. of E.S.S.*, 658 S.W.3d 613, 616 (Tex. App.—El Paso 2022, no pet.). We will reverse a trial court's judgment only when it appears from the record as a whole that the court has abused its discretion. *Int. of J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021).

"Under the abuse-of-discretion standard applicable to orders modifying the parent-child relationship, legal and factual sufficiency are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion." *Int. of N.S.*, No. 08-24-00362-CV, 2025 WL 994192, at *9 (Tex. App.—El Paso Mar. 28, 2025, no pet.) (mem. op.). "Review in this context is two-pronged: a reviewing court determines whether the trial court (1) had sufficient evidence on which to exercise its discretion and (2) erred in applying its discretion." *Id.* "Traditional sufficiency review comes into play under the first prong." *Id.* "We then decide whether, based on the evidence adduced at trial, the trial court made a reasonable decision." *Id.*

"A trial court does not abuse its discretion if evidence of a substantive and probative character exists to support its decision." *N.S.*, 2025 WL 994192, at *9. When the evidence is conflicting, we presume the trial court, as factfinder, resolved the inconsistency in favor of its order if a reasonable person could do so because the court is in the best position to observe the witnesses and their demeanor. *Id.* "Accordingly, the mere fact that the appellate court might decide the issue differently than the trial court does not establish an abuse of discretion." *Id.*

6

### III. Exclusive Right to Make Education Decisions

In her first issue, Jasmine asserts the trial court abused its discretion by granting Jun the exclusive right to make all education decisions for A.L.K. because the evidence is legally and factually insufficient to support the ruling that such a modification is in the best interest of the child and to support the finding that a material and substantial change had occurred in the life of the child and of the parties that would support granting Jun the exclusive right to make all education decisions for ALK. In her second issue, she asserts the trial court abused its discretion when it granted Jun the exclusive right to make all education decisions for A.L.K. because the evidence was very clear and unrebutted that it is not in the best interest of A.L.K. that Jun have this exclusive right, and "the trial court's ruling[] is clearly wrong and manifestly unjust, and goes against the preponderance of the evidence presented."

#### A. Material and substantial change in circumstances

We first address Jasmine's assertion that the evidence is insufficient to support the finding that the "circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since . . . the date of the rendition of the order." Tex. Fam. Code Ann. § 156.101(a)(1)(A). To do so, we must examine the conditions existing at the time the September 2020 order was entered as compared to the circumstances existing at the time of the hearing on the motion to modify. *See C.C.J.*, 244 S.W.3d at 919.

"It is well-established that when the evidence demonstrates that one or both of the parties has married or become engaged to another individual after the entry of the prior order, a court may consider this to be a material and substantial change justifying a modification." *Int. of M.V.*, 583 S.W.3d 354, 362 (Tex. App.—El Paso 2019, no pet.). "This is particularly true when the newly married or engaged parent . . . intends to relocate, a significant distance away as the result of the marriage or engagement." *Id.*

7

The original order was entered on September 30, 2020. Jun remarried after that time and before the de novo hearing. Jasmine, too, remarried and had a baby after 2020 order and before the de novo hearing. Although Jun, his wife, and Jasmine all lived in El Paso, Jasmine does not dispute that her new husband lives in Georgia and she intends to move there to be with him. Based on these facts, we conclude that Jun satisfied his burden of demonstrating that a material and substantial change in circumstances occurred after the time the original order was entered, thereby making it appropriate for the trial court to consider his modification request. *See id*. Therefore, we next address whether the modification allowing Jun to make all education decisions was in A.L.K.'s best interest.

## B. Best interest

When, as here, a trial court appoints both parents as joint conservators of a child, the court is required to "specify the rights and duties of a parent that are to be exercised: (1) by each parent independently; (2) by the joint agreement of the parents; and (3) exclusively by one parent." Tex. Fam. Code Ann. § 153.071. "'Joint managing conservatorship' means the sharing of the rights and duties of a parent by two parties, ordinarily the parents, even if the exclusive right to make certain decisions may be awarded to one party." *Id.* § 101.016. The Family Code does not define how a trial court shall assign or implement the various rights and duties of the conservators; therefore, a trial court retains broad discretion in "crafting the rights and duties of each conservator so as to effectuate the best interest of the child." *See Jenkins v. Jenkins*, 16 S.W.3d 473, 483 (Tex. App.—El Paso 2000, no pet.). "In general, when the evidence demonstrates that the parties are experiencing difficulty in effectively co-parenting or communicating, or difficulty in reaching shared decisions, a trial court is justified in selecting one parent as an exclusive decision-maker to avoid conflict." *Int. of S.G.*, 2020 WL 103971, at *8.

### C. December 2022 hearing

The order in effect at the time of December 2022 hearing designated Jasmine as the conservator with (1) "the exclusive right to designate the primary residence of the child . . . without regard to geographic location" and (2) "the right to make decisions concerning the child's education." At the time of this hearing, Jasmine had enrolled A.L.K. in kindergarten at North Loop Elementary. Jun testified about his concerns over Jasmine's choice of this school for A.L.K. He said Jasmine dropped her children off with her grandmother who lives in a "high-crime" area; however, no evidence was submitted to support Jun's contention that Jasmine's grandmother lived in a "high-crime" area. Jun said other family members also left their children with the grandmother. According to Jun, Jasmine told him that one of the other children, who was a toddler, walked outside and no one noticed while in the grandmother's care. A stranger brought the child back to the grandmother's house, which was when everyone realized the child was gone.

Jun testified that one of Jasmine's uncles is a drug addict and "[has] been in and out of jail" with a "bad criminal history." Jun said that every time he has seen this uncle, "it seems like he's always under the influence" and "it's just really concerning for him to be around" A.L.K. Jun said Jasmine also told him that her other daughter, L.M., "[was] getting . . . beat up and quote / unquote 'jumped,' . . . at the school[.]" He was also concerned that A.L.K. was taking a bus to school because A.L.K.'s motion sickness would cause her to feel nauseous when riding the bus. He stated North Loop Elementary was "so far" from where Jasmine lived. He said he asked Jasmine why she did not enroll A.L.K. in a school closer to where they lived and Jasmine told him that North Loop Elementary was closer to the grandmother who would pick A.L.K. up after school and care for her.

Jun said that before he and Carol moved to El Paso, they researched which areas were the safest and which had the best schools. They decided to move to the Northern Pass and Redd Road

9

area because there were several schools that had a "better teacher-to-student ratio[,] which [allowed] the kids to learn better." He said a few of these schools were Tippin Elementary, Keystone Academy, and Reyes Elementary, all of which in his opinion had "better overall testing." Jun explained why he believed Tippin Elementary and Keystone were better schools, but he did not mention Reyes Elementary. Jun said Carol set up an account for A.L.K.'s college expenses. He said every time he tried to talk to Jasmine about A.L.K.'s future education, Jasmine would "just blow [him] off and she would refuse to talk about it."

Jasmine testified that the schools in her area were "A-1" schools, and North Loop Elementary was a "great school," was well-secured, and had security guards. She said she volunteered ten-plus hours a week at the school. Jasmine explained why she enrolled A.L.K. in North Loop Elementary even though they lived a distance away. She said she was very familiar with the school because she grew up in the area and A.L.K.'s cousins go to those schools. She said she was very involved in A.L.K.'s school and she knew the teachers. Jasmine stated they were "not bad schools." She said A.L.K. was not enrolled at North Loop Elementary because it was close to her grandmother's house and she denied relying "heavily" on her grandmother for help.

In its December 12, 2022, order, the associate judge awarded Jun the exclusive right to make decisions regarding A.L.K.'s education and ordered him to "confer with [Jasmine] before making decisions regarding the child's education." On December 14, 2022, Jasmine filed a request for a de novo hearing.

**D. May 2023 de novo hearing**

A de novo hearing was commenced on May 22, 2023, by which time Jun had enrolled A.L.K. in kindergarten class at Reyes Elementary. During this hearing, several witnesses testified, including Jun, Jasmine, and individuals from the two schools.

### (1) Jun's testimony

Jun testified that he did not understand why Jasmine had enrolled A.L.K. at North Loop Elementary, which was 30 minutes from her house, because there were "pretty good schools" where Jasmine lived. He said Reyes Elementary was close to where he lived. He again talked about the research he and Carol did into various schools and how they choose the neighborhood in which they lived because of the schools. He said he did not enroll A.L.K. in Reyes Elementary for the purpose of making it harder for Jasmine to exercise her visitation or because he wanted her to drive an extra ten minutes in addition to the 30 minutes she was already driving. He said three of A.L.K.'s cousins also attend Reyes Elementary. According to Jun, they have gotten "great feedback" from her teacher and paperwork from a parent-teacher conference showing "a steep incline of her improving."

### (2) Jasmine's testimony

Jasmine testified that she lived in an apartment on Zaragoza in far east El Paso and she chose to enroll A.L.K. in North Loop Elementary located "in the lower valley." Jasmine said her grandmother lives two or three streets from the school and can pick up A.L.K. in an emergency. Jasmine said that when Jun told her he was enrolling A.L.K. in Reyes Elementary, she was "very emotional" because she could not believe Jun was taking A.L.K. away from all her North Loop Elementary friends and from her extended family in the area. She believed this would hurt A.L.K. However, she disagreed that she would be doing "far worse" by moving A.L.K. to Georgia. According to Jasmine, moving A.L.K. to Georgia would not hurt her.

Jasmine said the drive to North Loop Elementary took only about 15 minutes, and the drive from her house to Reyes Elementary took 30 to 45 minutes. She stated A.L.K. gets out of school at 3:05 p.m. and she needs to leave her house at 1:15 p.m. to pick her up. She also repeated the time she spent volunteering at North Loop Elementary. When Jasmine was asked to compare the

11

security at the two schools, she said that when you enter the North Loop Elementary campus, you have to ring a doorbell, a camera pops up, and you are asked to state your name and reason for being at the school. But, at Reyes Elementary, you ring the doorbell "and they just open the door" and you walk in; she has never been asked to identify herself there.

Jasmine also compared the student work at both schools. At North Loop Elementary, it took about 45 minutes to help A.L.K. with her homework because A.L.K. had daily reading, writing, and math. She also had weekly spelling tests. A.L.K. had to learn her letters and how to count. On the other hand, at Reyes Elementary, homework took "[a]bout two, three minutes" because it was "very simple homework"—"[w]rite this," "color the picture," and "[c]olor the ABC's." She said Reyes Elementary assigned no homework in May, while at North Loop Elementary "May is the most important month," with "a lot of tests" including math, reading, and writing—all focusing on the testing.

When Jasmine placed A.L.K. in North Loop Elementary, she specifically selected A.L.K.'s teacher, Ms. Teran, because Teran had been a teacher for many years, had a lot of teaching experience, and had taught almost every child in Jasmine's family, including her daughter L.M. Jasmine described Teran as "an amazing teacher" who "strives for her students to do their best" and "wants the best for her students."

Regarding A.L.K. riding the bus to school, Jasmine explained that the Ysleta School District Pre-K is "very strict as to who comes in and out of the school," and they do not want all the cars dropping the children off in the morning. She said the school has "a designated area in the back" "but their number one transportation is the bus." She stated that A.L.K. "always told [her], 'Mom, I want to go on the bus, I want to go on the bus,'" and the idea of riding the bus made A.L.K. happy. Jasmine said A.L.K. never had motion sickness.

Jasmine stated that if the court allowed her to make A.L.K.'s educational decisions, she would re-enroll her daughter in North Loop Elementary because she has seen a "tremendous . . . change in her education" since she has been at Reyes Elementary. According to Jasmine, A.L.K.'s "writing has gotten so sloppy." She said that at North Loop Elementary, the children had their homework and A.L.K. knew when and where to capitalize and when to use lower case, but now her writing is "just all over the place." She said there is no reading, whereas she and A.L.K. used to read a book every day at North Loop Elementary and the school logged the reading and gave the children a treat at the end of the month. At North Loop Elementary, A.L.K. had math homework, but at Reyes Elementary the children do not have math homework. At North Loop Elementary, A.L.K. learned ten "sight" words per month, but at Reyes Elementary, she only learned one or two.

When Jasmine has A.L.K., she spends about three hours a day on the road, which affects her ability to find a job. Jasmine said she gets up around 5:00 a.m. and then wakes A.L.K. up anywhere from 5:45 a.m. to 6:00 a.m. because they need to be out of the house by 6:30 to get to A.L.K.'s school in time. Jasmine will wake L.M. up as they are leaving, and she will go with Jasmine to drop A.L.K. off at school. Jasmine also takes the baby with her.

(3) **Testimony of individuals from the schools**

Candice Dominguez, A.L.K.'s kindergarten teacher at Reyes Elementary, described A.L.K. as a very happy girl with "a lot of friends in the classroom," and who is willing and excited to learn. Dominguez said there were 16 students in her class and when A.L.K. arrived in January she had a "good . . . amount of letter and sound knowledge," but she could not read, which was typical of a student in January. Dominguez said A.L.K. can now read and there is "some homework." A.L.K. is very comfortable in all areas, including math, science, and using her iPad. She explained that an early reading and language arts assessment showed a "sharp trend up," which

13

meant that A.L.K. was showing growth, retaining what they were doing in the classroom, and learning. She said she does not use a reading log in her kindergarten class. Dominguez said Jun, Jun's wife, and Jasmine all communicated regularly via the school app. Dominguez was shown a portion of a text message from Carol that Domiguez described as "it appears that the conversation might have started with her . . . wanting to volunteer or do something."

Dominguez testified that Jasmine never complained that A.L.K.'s grades or handwriting had gotten worse since attending Reyes Elementary; never mentioned that A.L.K. was "doing great with word recognition and phonics at North Loop Elementary" but now was struggling; and never said that A.L.K. was doing less homework now than she did at North Loop Elementary. Dominguez said she saw A.L.K.'s report card from North Loop Elementary and, although she did not remember the child's grades, she said "they looked to be similar to . . . how [she saw A.L.K.] in [her] classroom."

Teran, the kindergarten teacher who taught A.L.K. when she was enrolled at North Loop Elementary, testified that she also taught L.M. at another school. She said Jasmine was a frequent volunteer at the school. She stated that the last day A.L.K. was in her class was December 16, 2022. Teran described A.L.K. as a "very good student" who completed all her homework, was very well behaved, was a "role model student," and an "A/B" student. She believed homework should take 30 minutes or less because it involved reading, writing, reciting numbers and sounds, and practicing sight words. In her classroom, the children learn ten sight words per month and take spelling tests. Teran said Jasmine attended all school events.

When shown a photo of A.L.K.'s homework from Reyes Elementary, Teran said it looked like A.L.K. had to match words with a picture and write a sentence at the bottom of the page. Teran said the homework she assigned was different in the sense that she expected the students to work more independently to apply what they learned in class. For example, the children would write a

14

sentence based on a sight word. Teran stated that A.L.K. was getting 100's on her spelling tests, her writing was progressing, she was starting to write sentences independently, and her illustrations "were beautiful – with a lot of detail." A.L.K. was reading at a "Level 1, 2" in her first semester, and she was "right on average" with the goal of reading at a Level 4 or higher by the end of kindergarten. Teran said she felt safe on the school campus and never felt threatened or in danger. She said the school district had high security at all of its schools, people can only access the doors with an identification card, the schools have a security guard, and all the doors had to be closed and locked.

Christopher Puga, the North Loop Elementary principal, stated North Loop Elementary is in the Ysleta Independent School District, an A-rated district, and North Loop Elementary is rated B-plus. When asked about the security, Puga said the school has a camera; to get in, a person pushes a button and the receptionist will ask to see identification before allowing the door to open. He confirmed that Jasmine volunteered at the school.

Finally, Maria Gandara, who worked for the Ysleta School Independent District at Ysleta Pre-K Center, testified that the school encouraged students to use the buses for safety reasons and parents were no longer allowed into the school.

### (4) Court's ruling

At the conclusion of the hearing, the trial court stated:

> I do have some concerns and I do have some hesitation regarding the distance that both of these parties reside. Not because it's difficult for you to drive or for you to drive, but because it's difficult for [A.L.K.]; and that's my sole concern, is that . . . it's exhausting on her.
>
> .     .     .
>
> . . . I would urge [Jun to] consider an excellent school that might be in a more midway point between the two of you. It is not a court order, I am just urging you to think about what might make it easier. . . . So I am not concerned about [A.L.K.] remaining [in her current school district], but those are considerations to

15

make. [Jun] is ordered to confer with [Jasmine] before making decisions regarding [A.L.K.'s] education.

### (5) Analysis

In this case, the following *Holley* factors do little to differentiate the abilities of these two apparently fit parents: the emotional and physical danger to the child now and in the future; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the act or omissions of the parent. *See Holley*, 544 S.W.2d at 371–72. Several *Holley* factors are neutral because the record does not demonstrate that either parent endangered A.L.K., could not provide for A.L.K.'s emotional and physical needs now and in the future, or could not provide A.L.K. with a stable home.

Regarding the plans for A.L.K., the trial court was entitled to believe Jun's testimony that Carol set up a fund for A.L.K.'s college expenses and that every time Jun tried to talk to Jasmine about A.L.K.'s future education, Jasmine would "just blow [him] off and she would refuse to talk about it." Furthermore, although removing A.L.K. from North Loop Elementary separated A.L.K. from the friends she had made at that school, there is no dispute that moving the child to Georgia would separate her from those same friends.

As to the parents' conflicting concerns, "it is a matter for the trial court's discretion to balance the concerns raised by each parent." *Int. of C.M.I.*, No. 07-21-00310-CV, 2022 WL 17670474, at *4 (Tex. App.—Amarillo Dec. 14, 2022, no pet.) (mem. op.). On this record, keeping in mind that the trial court was the sole decider of witness demeanor and credibility, and under the highly deferential standard of review applied in modification cases, we cannot conclude that the trial court abused its discretion when it determined, as between the parents, that Jun should be granted the exclusive right to make education decisions for A.L.K. Accordingly, we overrule Jasmine's first and second issues.

16

# IV. 50-50 CUSTODY ORDER

In her third issue, Jasmine asserts the trial court abused its discretion by "ordering a 50 50 possession order, which is really a 50 50 custody order," because Jun did not request such relief and because it is not in A.L.K.'s best interest "given the distance between the residences of the parents, which situation is the result of [Jun] deliberately obtaining housing 35 miles away from the residence of [Jasmine] when [Jun] moved to El Paso 2 months before the final hearing."

## A. Requested relief

As a general rule, a judgment must conform to the pleadings filed in a case. *Int. of S.G.*, 2020 WL 103971, at *5. "However, in cases involving child custody and child support issues, where the 'best interest' of the child is the paramount concern, technical pleading rules do not carry the same weight as they would in a typical civil case." *Id.* "Once a child is brought under the trial court's jurisdiction by the filing of a suit asking the court to resolve custody and child support issues, it becomes the duty of the court 'in the exercise of its equitable powers to make proper disposition of all matters comprehended thereby in a manner supported by the evidence.'" *Id.* "Therefore, when the parties' pleadings request a modification of a child support or custody order, the parties have 'fair notice' of the issues to be decided in the litigation, and the pleadings need not request the 'specific modifications' ultimately made by the trial court." *Id.* (internal citation omitted).

In his amended petition, Jun requested "possession of and access to [A.L.K.] according to the Standard Possession Order or as deemed appropriate by a family therapist." Jasmine provides no legal authority for any argument that such a request must be more specific. We conclude Jasmine was on notice of the possibility that the trial court could alter the possession schedule. *See id.*

17

**B. Best interest**

Jasmine also contends the "50 50 custody order" was not in A.L.K.'s best interest "given the distance between the residences of the parents." The trial court appointed both parents as joint managing conservators of A.L.K. The Family Code defines "joint managing conservatorship" as "the sharing of the rights and duties of a parent by two parties, ordinarily the parents, even if the exclusive right to make certain decisions may be awarded to one party." Tex. Fam. Code Ann. § 101.016. "The court shall specify in a standard possession order that the parties may have possession of the child at times mutually agreed to in advance by the parties and, in the absence of mutual agreement, shall have possession of the child under the specified terms set out in the standard possession order." *Id.* § 153.311. "It is the policy of this state to encourage frequent contact between a child and each parent for periods of possession that optimize the development of a close and continuing relationship between each parent and child." *Id.* § 153.251(b).

Here, the trial court entered what it referred to as "2-2-3-3 Equal Parenting Time." The order provided that exchanges that "do not occur at school shall take place at the residence of the surrendering parent." At the time of the hearing, the parties resided in El Paso. According to Jasmine, they lived 35 miles apart. Other than Jasmine's complaint that the commute to and from Reyes Elementary was exhausting for A.L.K., she does not present any authority to support her contention that the 2-2-3-3 possession schedule was an abuse of discretion based on a 35-mile distance between her residence and Jun's residence. Therefore, Jasmine has not demonstrated that the trial court abused its discretion by ordering an equal possession schedule. Accordingly, we overrule her third issue.

## V. Two-Hour Right of Refusal

The associate judge granted each party a right of first refusal to care for A.L.K. when a party could not personally care for the child for a period of two hours or more. After the de novo

18

hearing, the court removed that specific language and, instead, ordered that "[e]ach conservator . . . give notice to the person in possession of the child on each occasion that the conservator will be unable to exercise that conservator's right of possession for any specified period," granting each party a right of first refusal to care for the child when a party cannot personally care for the child if the parent in possession will not be present overnight. In her fourth issue, Jasmine asserts the trial court abused its discretion by sua sponte removing the two-hour right of first refusal when neither party requested that it be removed.

Jasmine herself requested a de novo hearing to review and reform, among other rulings, that portion of the associate judge's order granting each party a right of first refusal to care for A.L.K. when a party could not personally care for her for a period of two hours or more. Jasmine has not demonstrated the trial court abused its discretion. Accordingly, we overrule Jasmine's fourth issue.

## VI. Geographic Restriction

The trial court ordered "the primary residence of the child shall be El Paso County, Texas, and the parties shall not remove the child from El Paso County, Texas for the purpose of changing the primary residence of the child until further order of the court of continuing jurisdiction or by written agreement signed by the parties and filed with the court." In her fifth issue, Jasmine asserts this ruling was an abuse of discretion.

The entirety of Jasmine's argument, as follows, focuses on Jun's alleged abusive conduct and his desire to control her:

> The apparent motivation of [Jun] is clear. For 2 ½ years he was content in living in Austin and doing his best to "control" [Jasmine]. It is very clear that he engaged in extreme abusive conduct towards her. Once she tells him she is getting married and moving to Georgia, he realizes that he has [sic] losing, if he has not already lost "control" over her. So how does he regain control[?] He puts her in this difficult and exhausting position for the child. . . . So now he has [Jasmine] under control again, keeping her in El Paso and having her commute 2 or 3 days a week, 140 miles a day. If he really cared about the child, he would have moved to a

19

location on the east side of El Paso where his daughter would not be placed in a "difficult" and "exhausting" situation. But he does not care. His motivation is about control and about punishing [Jasmine] for leaving him.

Other than these allegations, Jasmine provides no legal authority for her argument. Therefore, Jasmine has not demonstrated that the trial court abused its discretion by placing a geographic restriction on A.L.K.'s residence. Accordingly, we overrule her fifth issue.

## VII. CONCLUSION

For the reasons stated above, we affirm the Final Order in Suit to Modify the Parent-Child Relationship After De Novo Hearing.


LISA J. SOTO, Justice

December 29, 2025

Before Salas Mendoza C.J., Palafox and Soto, JJ.
Palafox, J., concurring without opinion

20